IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **NEALE BEDROCK,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**METROPOLITAN NASHVILLE AIRPORT AUTHORITY,**<br><br>**Defendant.** | **No. ______________** |

## COMPLAINT

Plaintiff Neale Bedrock ("Bedrock" or "Plaintiff") brings this action against his former employer, Defendant Metropolitan Nashville Airport Authority (the "Authority" or "Defendant"), for retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Tennessee Human Rights Act ("THRA"). In support of his Complaint, Plaintiff states as follows:

## INTRODUCTION

1. Bedrock brings this action to remedy the Authority's retaliation against him for opposing conduct that he reasonably and in good faith believed could constitute unlawful race and sex discrimination. While serving as the Authority's Executive Vice President, General Counsel, and Chief Compliance Officer, Bedrock received a credible complaint from a senior executive that the Authority's President and Chief Executive Officer ("CEO"), Douglas Kreulen ("Kreulen"), had created a hostile work environment for her based on her race and sex. Bedrock reported the complaint to the Chair of the Authority's Board of Commissioners, initiated an independent investigation, and assisted in that investigation as a witness. After Kreulen learned of Bedrock's

role, the Authority, through Kreulen, progressively diminished Bedrock's executive responsibilities and access and ultimately terminated his employment on November 1, 2024.

## JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, because Plaintiff's Title VII claim arises under the laws of the United States. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's THRA claim, because it arises from the same case or controversy as his Title VII claim.

3. This Court has personal jurisdiction over the Authority; it employs individuals in this District.

4. Bedrock has satisfied all jurisdictional prerequisites to bringing this action. Specifically, Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") regarding his Title VII claim.

5. EEOC issued Bedrock a right-to-sue letter on his Charge of Discrimination less than 90 days prior to Plaintiff filing this action.

6. Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3). Bedrock alleges that the unlawful employment practices complained of occurred in this District and that he would have continued working for Defendant in this District but for the alleged unlawful employment practices.

## PARTIES

7. Mr. Bedrock is an individual who resides in Nashville, Tennessee.

8. The Authority is a metropolitan airport authority created under Tennessee Code Annotated section 42-4-104. Under Tennessee law, metropolitan airport authorities are public and

governmental bodies acting as agencies and instrumentalities of their creating and participating municipalities, and the Authority constitutes a body politic and corporate.

9. Defendant may be served with process "by delivering a copy of the summons and of the complaint to any officer or managing agent thereof." Tenn. R. Civ. P. 4.04(9); *see also* Fed. R. Civ. P. 4(j)(2).

10. At all relevant times, the Authority was Bedrock's employer under Title VII.

11. At all relevant times, Bedrock was an employee of Defendant under Title VII.

12. At all relevant times, the Authority was Bedrock's employer under the THRA.

13. At all relevant times, Bedrock was an employee of Defendant under the THRA.

**FACTS**

14. The Authority manages, operates, finances and maintains Nashville International Airport and John C. Tune Airport.

15. Plaintiff began work for Defendant on March 18, 2021, as its Executive Vice President, General Counsel, and Chief Compliance Officer.

16. Bedrock was identified in a national search for his position and moved from Florida to Nashville to take the job.

17. Plaintiff was employed by the Authority from March 18, 2021, until November 1, 2024.

18. Throughout his tenure with Defendant, Bedrock reported directly to the Authority's CEO, Kreulen.

19. During his tenure, Plaintiff consistently received high marks in the semiannual performance reviews conducted by Kreulen.

20. In his July 2023 performance review, Kreulen commended Bedrock for "exceed[ing] expectations" and being a "[s]trong decision maker," "[s]uperior under pressure," and a "[s]uperior leader."

21. Plaintiff's job performance rating average across all categories for the July 2023 performance review was 4.6 out of 5.

22. In his December 2023 performance review, Kreulen commended Bedrock for being an "exceptional member of the Executive team," "[e]xcellent at developing and recruiting talented staff to support the authority," and an "exceptional lawyer and industry leader."

23. Plaintiff's job performance rating average across all categories for the December 2023 performance review was 4.6 out of 5.

24. Bedrock's December 2023 performance review did not note any concerns regarding internal relationships at the organization.

25. Plaintiff's December 2023 performance review did not note any concerns regarding fiscal stewardship.

26. On June 11, 2024, a senior MNAA executive credibly reported to Bedrock, in his capacity as General Counsel, that she believed Kreulen had created a hostile work environment because of her race (Black) and sex (female).

27. Based on the nature of the allegations, Bedrock reasonably and in good faith believed that the complaint raised potential violations of Title VII and the THRA and required investigation.

28. Bedrock reported the complaint to the Chair of the Authority's Board of Commissioners ("Board") and initiated the process for an independent investigation of the allegations.

29. Bedrock assisted the independent investigation and participated in it as a witness.

30. On June 27, 2024, approximately two weeks after the complaint was reported, Kreulen issued Bedrock his final performance review. Kreulen reduced Bedrock's average job-performance score from 4.6 to 4.4 out of 5 but continued to rate Bedrock highly and thanked him for his "strong performance in 2024."

31. During the investigation, Kreulen learned that Bedrock had reported the complaint to the Board Chair and had caused the independent investigation to be initiated. A member of the Board subsequently informed Bedrock that Kreulen had stated that Bedrock had "created this problem."

32. Shortly after Bedrock reported the discrimination complaint to the Board Chair and initiated the independent investigation, Kreulen ceased having his weekly one-on-one meetings with Bedrock.

33. Shortly after Bedrock reported the discrimination complaint to the Board Chair and initiated the independent investigation, Kreulen stopped routinely copying Bedrock, the Authority's General Counsel and Chief Compliance Officer, on communications with members of the Board that Bedrock previously received as part of his executive responsibilities.

34. On July 25, 2024, while the independent investigation was ongoing, Kreulen established five performance objectives for Bedrock for the upcoming fiscal year.

35. Four of the five objectives depended in substantial part on decisions or approvals by individuals other than Bedrock.

36. Three objectives required Bedrock to produce programs or documents and to "gain" approval of those items by the CEO or "MNAA Staff, CEO, and Board."

37. Another objective, which accounted for 20% of Plaintiff's performance objectives, required Bedrock to apply for and be accepted to Leadership Tennessee, a highly competitive and selective statewide leadership program whose admissions decision was outside Bedrock's control.

38. On August 26, 2024, Kreulen disinvited Bedrock from five previously scheduled strategy meetings attended by the executive team, further reducing Bedrock's participation in matters within his executive role.

39. On September 9, 2024, Kreulen changed the seating chart for Board meetings to move Bedrock, the Authority's General Counsel and Chief Compliance Officer, from the table where the Board sat to a seat among the general audience.

40. On October 18, 2024, less than two weeks before terminating Bedrock, the Authority paid Bedrock his full performance bonus for fiscal year 2024.

41. On November 1, 2024, Plaintiff was called into a meeting with Kreulen.

42. At the meeting on November 1, 2024, Kreulen and the Authority terminated Bedrock's employment without cause. The written termination notice stated only that Bedrock's services were "no longer needed."

43. Before his termination, the Authority never placed Bedrock on a performance improvement plan, issued him written discipline, or advised him that his performance placed his employment in jeopardy.

44. At the meeting on November 1, 2024, Defendant did not identify any performance-related reason for firing Bedrock.

45. In communications immediately following the termination on November 1, 2024, the Authority still did not identify any performance-related reason for firing Plaintiff.

46. Any stated reason for Bedrock's termination that Defendant raises in this lawsuit will be a post-hoc pretext for unlawful retaliation in violation of Title VII and the THRA.

## COUNT I
## Retaliation under Title VII

47. Plaintiff incorporated by reference all the prior allegations in this Complaint.

48. Bedrock engaged in activities protected by Title VII's opposition clause, 42 U.S.C. § 2000e-3(a), by opposing conduct that he reasonably and in good faith believed could constitute unlawful race and sex discrimination, including by reporting the complaint to the Board Chair, initiating an independent investigation, and assisting in that investigation as a witness.

49. Defendant, including Kreulen, knew that Plaintiff had engaged in Title VII–protected activities.

50. The Authority subsequently subjected Bedrock to materially adverse employment actions because of his Title VII–protected activities, including but not limited to his termination. The earlier reduction in his performance rating and the progressive diminution of his executive access, responsibilities, and influence constitute additional evidence of the retaliatory course of conduct that preceded his termination.

51. Bedrock's protected activities were a but-for cause of the materially adverse actions taken against him, including but not limited to his termination. The timing and progression of the Authority's conduct, Kreulen's knowledge of Bedrock's role in initiating the investigation, Bedrock's strong contemporaneous performance record, and the Authority's lack of explanation for the termination support the causal connection.

52. The Authority's unlawful retaliation caused Bedrock damages, including but not limited to lost wages, lost benefits and other compensation, back pay, front pay, compensatory damages, attorneys' fees, costs, and interest.

## COUNT II
## Retaliation under the THRA

53. Plaintiff incorporates by reference the allegations in paragraphs 1–46 of this Complaint.

54. Bedrock opposed practices that he reasonably and in good faith believed were discriminatory under the THRA and assisted and participated in the independent investigation of those practices, activities protected by Tennessee Code Annotated section 4-21-301(a)(1).

55. Defendant, including Kreulen, knew of Bedrock's THRA–protected activities before taking the materially adverse actions alleged in this Complaint.

56. The Authority subsequently subjected Bedrock to materially adverse employment actions because of his THRA–protected activities, including but not limited to his termination. The earlier reduction in his performance rating and the progressive diminution of his executive access, responsibilities, and influence constitute additional evidence of the retaliatory course of conduct that preceded his termination.

57. Bedrock's protected activities were a but-for cause of the materially adverse actions taken against him, including but not limited to his termination. The timing and progression of the Authority's conduct, Kreulen's knowledge of Bedrock's role in initiating the investigation, Bedrock's strong contemporaneous performance record, and the Authority's lack of explanation for the termination support the causal connection.

58. The Authority's unlawful retaliation caused Bedrock damages, including but not limited to lost wages, lost benefits and other compensation, back pay, front pay, compensatory damages, attorneys' fees, costs, and interest.

## PRAYER FOR RELIEF

Based on the foregoing, Bedrock prays for the following relief from this Court:

A. Awarding Plaintiff damages for retaliation under Title VII and the THRA, including but not limited to back pay, front pay, lost benefits and other compensation, actual and compensatory damages, and appropriate equitable relief;

B. Requiring Defendant to pay all the attorneys' fees that Bedrock incurs to bring and to maintain this action;

C. Requiring the Authority to pay the costs and expenses of this action;

D. Requiring Defendant to pay pre-judgment and post-judgment interest as provided by law; and

E. Granting Bedrock such other general relief to which he may be entitled.

Date: August 24, 2026

Respectfully submitted,

/s/ *Charles P. Yezbak, III*

Charles P. Yezbak, III (TN BPR # 018965)
/s/ *Melody Fowler-Green*
Melody Fowler-Green (TN BPR # 023266)
/s/ *N. Chase Teeples*
N. Chase Teeples (TN BPR # 032400)
YEZBAK LAW OFFICES PLLC
P.O. Box 159033
Nashville, TN 37215
Tel.: (615) 250-2000
Fax: (615) 250-2020
yezbak@yezbaklaw.com
mel@yezbaklaw.com
teeples@yezbaklaw.com

*Counsel for Plaintiff*